No. 14-14238

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

STACEY MATTOCKS,

*Plaintiff/Appellant,*

v.

BLACK ENTERTAINMENT TELEVISION, LLC,

*Defendant/Appellee.*

On Appeal from the United States District Court
for the Southern District of Florida

**INITIAL BRIEF OF APPELLANT**

TRIPP SCOTT, P.A.
*Counsel for Appellant*
110 SE Sixth Street, 15th Floor
Ft. Lauderdale, Florida 33301
Tel: 954.525.7500; Fax: 954.761.8475

Alexander D. Brown, Esq.
Fla. Bar No. 752665
adb@trippscott.com
Adam S. Goldman, Esq.
Fla. Bar No. 86761
asg@trippscott.com

No. 14-14238
*Mattocks v. Black Entertainment Television, LLC*
C-1 of 2

## APPELLANT'S CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26 and Eleventh Circuit Rule 26.1-1, the following individuals/entities have an interest in this litigation.

1. BET Holdings, LLC, sole member of Black Entertainment Television LLC, Defendant-Appellee

2. Black Entertainment Television, LLC, Defendant-Appellee

3. Brown, Alexander D., Counsel for Plaintiff-Appellant

4. Cohn, Hon. James I., United States District Court Judge, Southern District of Florida

5. Gaines, Jonathan L., Counsel for Defendant-Appellee

6. Goldman, Adam S., Counsel for Plaintiff-Appellant

7. Gray Robinson, P.A., law firm of Defendant-Appellee's counsel

8. Herman, Peter G., Counsel for Plaintiff-Appellant

9. Jenner & Block, LLP, law firm of Defendant-Appellee's counsel

10. Kohlmann, Susan,  Counsel for Defendant-Appellee

11. Mattocks, Stacey, Plaintiff-Appellant

12. Platzer, Luke, Counsel for Defendant-Appellee

13. Ross, Erica, Counsel for Defendant-Appellee

14. Seltzer, Hon. Barry S., United States District Court Magistrate

i

No. 14-14238
*Mattocks v. Black Entertainment Television, LLC*
C-2 of 2

Judge, Southern District of Florida

15. Stetson, Karen, Counsel for Defendant-Appellee

16. Tripp Scott, P.A., law firm of Plaintiff-Appellant's counsel

17. Viacom Inc. (VIA, VIAB), sole member of BET Holdings LLC

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests that the Court entertain oral argument in this matter. This appeal presents novel issues of law regarding intangible property rights and the value thereof – specifically, Facebook "Likes" obtained by someone who creates and operates a Facebook fan page – and oral argument will provide the Parties with an opportunity to address any questions this Court may have on this issue.

## TABLE OF CONTENTS

**APPELLANT'S CERTIFICATE OF INTERESTED PERSONS** ...................... i

**STATEMENT REGARDING ORAL ARGUMENT** .......................... iii

**TABLE OF CONTENTS** ........................................ iv

**TABLE OF CITATIONS** ....................................... vi

**STATEMENT OF JURISDICTION** ................................ viii

**STATEMENT OF THE ISSUES** ..................................1

**STATEMENT OF THE CASE** ...................................2

    **A. Course of Proceedings and Disposition in the Court Below** .....................3

    **B. Statement of the Facts** ...................................4

    **C. Standard of Review** .....................................12

**SUMMARY OF THE ARGUMENT** ................................ 13

**ARGUMENT / CITATIONS OF AUTHORITY** ...................... 17

    **A. The District Court Erred in Determining that Mattocks Did Not Produce Substantial Evidence that Facebook's Decision, Which was Prompted by BET's Request, to Remove and Disable Mattocks' Facebook Page and Contemporaneously Transfer the Likes Mattocks Had Obtained Over to BET's Facebook Page was Based on Anything Other than Facebook's Policies.** ..................................17

    **B. The District Court Erred in Determining that Mattocks Breached the Letter Agreement** .........................................29

        *i. BET did not Bargain for or Even Desire the Right to Manually Update Content on Mattocks' FB Page.* ....................................... 31

        *ii. BET was Never Prevented from Updating the Content on Mattocks' FB Page.* ............................................. 35

*iii. The Letter Agreement Did Not Require BET to be Granted "Full" Administrative Access and, therefore, Mattocks' Temporary Change of BET's Level of Administrative Access Did Not Materially Breach the Letter Agreement.* ........................................................ 36

*a. The Letter Agreement Did Not Require BET to be Granted "full" administrative access* ........................................................ 37

*b. Even if, arguendo, the term "administrative access" is ambiguous, the District Court improperly usurped the role of the jury by construing its meaning* ...................................................... 40

**C. The District Court Erred in Granting Summary Judgment on Mattocks' Conversion Claim by Determining that Mattocks Did Not Have a Protectable Interest in the "Likes" She Obtained on Her Facebook Page, and that BET's Transfer/Migration Request of said Likes was Not Wrongful.** ........................................................... 41

**CONCLUSION** ........................................................................... 48

**CERTIFICATE OF COMPLIANCE** .................................................. 49

**CERTIFICATE OF SERVICE** ......................................................... 50

# TABLE OF CITATIONS

CASES

*Aereo Boliviano Airlines*, 09-CIV-22274, 2011 WL 1559823
(S.D. Fla. 2011) .................................................................... .17, 46

*Barakat v. Broward Cnty. Hous. Auth.*, 771 So. 2d 1193, 1195 (Fla. 4th DCA
2000) ........................................................................................ 35

*Benihana of Tokoyo, Inc. v. Benihana, Inc.*, 828 F. Supp. 2d 720, 728 (D. Del.
2011) ........................................................................................ 43

*Bland v. Roberts*, 730 F. 3d 368, 385 (4th Cir. 2013) ........................................ 2, 42

*Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231, 1232 (11th Cir. 1985)........ 41

*In re Corbin's Estate*, 391 So. 2d 731, 733 (Fla. 3d DCA 1980) ......... 43, 44, 45, 46

*CSDS Aircraft Sales & Leasing, Inc. v. Lloyd Aereo Boliviano Airlines*, 09-CIV-
22274, 2011 WL 1559823 (S.D. Fla. 2011)................................................. 17

*Curington v. State*, 86 So. 344 (Fla. 1920) ............................................................ 47

*Edwards v. Landsman*, 51 So.3d 1208, 1213 (Fla. 4th DCA 2011)...................... 18

*Esanu v. Oceana Cruises, Inc.*, No. 1:13-CV-22772-UU, 2014 WL 4954401, at
*2 (S.D. Fla. May 5, 2014) .......................................................................... 48

*Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1291 (11th Cir. 2001) ............. 18

*Haiman v. Gundersheimer*, 177 So. 199, 201 (Fla. 1937)................................ 39, 40

*Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen and Firemen Ret. Sys. of
Detroit*, 50 F.3d 908, 919 (11th Cir.1995.............................................. 40, 41

*Joe Hand Promotions, Inc. v. Creative Entm't, LLC,* 978 F. Supp. 2d 1236,
1241 (M.D. Fla. 2013) .......................................................................... 42, 43

*Joe Hand Promotions, Inc. v. Jacobson*, 874 F. Supp. 2d 1010, 1021 (D. Or.
2012)…………………………………………………………………………….47

*KMS Restaurant Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) ................................................................................................. 17, 18

*Mais v. Gulf Coast Collection Bureau, Inc.*, 13-14008, 2014 WL 4802457 (11th Cir. 2014) ..................................................................................................... 12

*Ness Racquet Club, LLC v. Ocean Four 2108, LLC*, 88 So. 3d 200, 203 (Fla. 3d DCA 2011) ............................................................................................... 40

*Smith v. Shelton,* 970 So.2d 450, 451 (Fla. 4th DCA 2007) .................................... 40

*Tippens v. Celotex Corp.*, 805 F.2d 949, 952-53 (11th Cir. 1986) ................... 12, 48

*Total Mktg. Techs., Inc. v. Angel Medflight Worldwide Air Ambulance Servs., LLC,* 2012 WL 33150, at *3 (M.D. Fla. Jan.6, 2012) ................................... 43

*Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, *8 (N.Y. 2007)…………46

*United States v. Feinstein*, 717 F. Supp. 1552, 1555 (S.D. Fla. 1989)............. 12, 29

*Waganer v. Sea-Land Serv., Inc.*, 486 F.2d 955, 960 (5th Cir. 1973) .................... 12

*WAM Properties, Inc. v. Desoto County, Florida*, 758 F. Supp. 1468, 1471-72 (M.D. Fla. 1991) .......................................................................................... 43

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1022 (11th Cir. 2014) ............................................................................................................ 40

## STATUTES

28 U.S.C. § 1291. ................................................................................................... viii

28 U.S.C. § 1332(a) ................................................................................................ viii

## TREATISES

William L. Prosser, *Law of Torts* 82-83 (4th ed. 1971).......................................... 45

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment entered by the United States District Court for the Southern District of Florida. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

In response to this Court's October 15, 2014 Jurisdictional Question, the Parties have agreed that the District Court had proper subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a), and have since filed Responses to this effect. Appellant has also filed a Motion for Leave to File a Third Amended Complaint along with a proposed Third Amended Complaint, which amends the jurisdictional allegations to reflect that complete diversity of citizenship exists.

## <u>STATEMENT OF THE ISSUES</u>

I.  Whether the District Court erred in determining that Mattocks did not produce substantial evidence that Facebook's decision, which was prompted by BET's request, to remove and disable Mattocks' Facebook Page and contemporaneously transfer the Likes Mattocks had obtained on her Facebook Page over to BET's Facebook Page, was based on anything other than Facebook's policies.

II. Whether the District Court erred in determining that Mattocks breached the Letter Agreement.

III. Whether the District Court erred by determining that Mattocks did not have a protectable interest in the Likes she had obtained on her Facebook Page.

## STATEMENT OF THE CASE

This case arose out of Appellee, Black Entertainment Television's ("BET") termination of its business relationship with Appellant, Stacey Mattocks ("Mattocks"), who created and managed a popular Facebook Fan Page for a television show airing on BET called *The Game* (the "FB Page").  Notably, Mattocks was able to acquire more than six million "Likes" from visitors to her FB Page, a reality that interested and financially benefited BET.[1]  Prior to Mattocks' termination, however, it has since been learned that BET contacted Facebook and successfully sought to disable Mattocks' FB Page and transfer the more than six million Likes obtained by Mattocks on her FB Page to a Facebook page BET had subsequently created for *The Game*. [DE 46].[2]  This litigation revolves around these acts by BET.

---

[1] As explained in *Bland v. Roberts*, 730 F. 3d 368, 385 (4th Cir. 2013), "'[l]iking' on Facebook is a way for Facebook users to share information with each other. The 'like' button, which is represented by a thumbs-up icon, and the word 'like' appear next to different types of Facebook content. Liking something on Facebook is an easy way to let someone know that you enjoy it. Liking a Facebook Page means you are connecting to that Page. When you connect to a Page, it will appear in your timeline and you will appear on the Page as a person who likes that Page. The Page will also be able to post content into your News Feed." (Internal citations omitted).

[2] Items in the record will be cited as "DE __ (if the record item is referred to generally), "DE __-__" (if a particular exhibit of the record item is cited), "DE __-__ at __:__-__:__" (if a particular part of a deposition transcript in the record is cited), or "DE __ at __ (if a particular page or paragraph of the record item is cited). The record citations refer to the District Court docket entry numbers.

### A.    Course of Proceedings and Disposition in the Court Below

On July 22, 2013, Mattocks filed her Complaint against BET in the United States District Court for the Southern District of Florida [DE 1]. On October 4, 2013, Mattocks filed her Amended Complaint [DE 5]. On November 12, 2013, BET filed its Motion to Dismiss Amended Complaint [DE 6], which was never adjudicated. On March 13, 2014, Mattocks filed the operative Second Amended Complaint [DE 46], which asserted the following causes of action: (1) tortious interference with Mattocks' agreement with Facebook; (2) tortious interference with Mattocks' agreement with Twitter; (3) breach of contract; (4) breach of duty of good faith and fair dealing; and (5) conversion. On March 28, 2014, BET filed its Motion to Dismiss Second Amended Complaint [DE 55], which was never adjudicated on its merits.[3]

On June 27, 2014, BET filed its Motion for Summary Judgment [DE 70]. On July 18, 2014, Mattocks filed her Response to BET's Motion for Summary Judgment [DE 84]. On July 28, 2014, BET filed its Reply to its Motion for Summary Judgment [DE 87]. On August 20, 2014, the Honorable Judge Cohn issued an Order Granting BET's Motion for Summary Judgment [DE 101], and issued a Final Judgment in favor of BET [DE 102]. At the time Summary Judgment was entered, this matter was set for trial for the two-week trial period

---

[3] BET's Motion to Dismiss was ultimately denied as moot in the District Court's Order Granting BET's Motion for Summary Judgment [DE 101].

commencing September 8, 2014 [DE 81].

Mattocks timely filed her Notice of Appeal on September 18, 2014 [DE 103], and this Appeal followed.

## B.    Statement of the Facts

Mattocks created her FB Page in 2008 when *The Game*, a sitcom about the lives of professional football players and their significant others, was airing on the CW Network. [DE 83-21].  *The Game* was canceled by CW in 2009. Nevertheless, Mattocks continued to operate her FB Page and, as a result, generated substantial interest in *The Game* and its actors with fans who located and began to follow and "Like" her FB Page. [DE 83-2 at 23:18-24:10] [DE 83-20 at 2-5] [DE 83-21] [DE 83-22].  In or about April 2010, due in significant part to Mattocks' efforts promoting *The Game* on her FB Page, BET picked up *The Game* and began to produce new episodes for air, beginning in January 2011. [*Id.*].

In or about October 2010, when Mattocks had obtained almost two million Likes on her FB Page, BET, through Monique Ware ("Ware"), its Vice President of Digital Marketing, reached out to Mattocks to ask if she would post various links and promotional stories about *The Game* on Mattocks' FB Page, in furtherance of Mattocks' efforts of creating excitement and buzz in advance of its anticipated premier on January 11, 2011. [DE 83-2 at 24:11–25:18] [DE 83-8 at 51:7-52:3] [DE 84-1].  BET requested Mattocks' assistance because it felt it was

4

critical to the success of *The Game* to engage its fans on social media. [DE 83-4 at 1] [DE 83-8 at 51:24-52:15; 71:8-15] [DE 83-11 at 27:15-28:23; 39:7-40:4; 57:6-18; 104:6-104:25] [DE 83-19] [DE 83-20 at 1-5] [DE 83-21] [DE 83-22] [DE 83-23]. In fact, BET hired J.P. Lespinasse ("Lespinasse") as BET's social media director specifically to build a social media team and develop social media strategies for its shows, including *The Game*. [DE 83-11 at 19:8-20:8].  That said, BET admittedly recognized the considerable fan base Mattocks had created for *The Game* on her FB Page, as well as the significant value Mattocks held as a fan of *The Game* who knew how to communicate with other fans. [DE 83-4 at 1] [DE 83-10] [DE 83-18] [DE 83-19] [DE 83-20 at 1-5] [DE 83-21] [DE 83-22] [DE 83-23] [DE 83-8 at 51:24-52:15; 61:11-16] [DE 83-11 at 57:6-18; 104:6-25].  This interest by BET in Mattocks ultimately led to the formation of a formal business relationship in November 2010, when BET hired Mattocks as a freelancer. [DE 83-9].  Thereafter, the Parties worked together to promote *The Game* on Mattocks' FB Page.

Prior to, and thereafter continuing throughout the Parties' relationship, Mattocks regularly posted to her FB Page in an effort to keep it current, relevant, and interesting to visitors of her FB Page. [DE 83-2 at 34:5-25] [DE 83-11 at 46:23-47:13; 51:19-52:3; 53:20-54-7].  Once the relationship with BET was consummated, however, Mattocks also started posting links and videos provided to

5

her by BET (Ware and Lespinasse, in particular) on her FB Page. [DE 70-13 at 18-20] [DE 83-9]. Notably, until the middle of February 2011, Mattocks was the only person with any sort of "administrative access" to her FB Page. Nevertheless, even after BET requested and was granted administrative access to Mattocks' FB Page in mid-February 2011 (a subject discussed below), BET, in the Parties' normal course of dealing, often asked permission from or forewarned Mattocks before it made any posts on its own to her FB Page. [DE 83-2 at 34:5-36:25]. Indeed, BET made only a handful of posts throughout the Parties' almost two-year relationship, as BET preferred to have Mattocks post because, from BET's perspective, she was a fan of *The Game* and had a unique ability to connect with other fans. [DE 83-10] [DE 83-11 at 46:23-47:13; 53:20-54:7; 80:24-81:8] [DE 83-19] [DE 83-23] [DE 84-13].

Remarkably, when *The Game* - **a once defunct television program** - premiered on BET on January 11, 2011, it ranked as the top ad-supported scripted series premiere in cable history, and was viewed by an incredible 7.7 million viewers. [DE 84-5]. *The Game* also generated the highest amount of social media buzz of all other prime-time television shows. [*Id.*]. At that time, Mattocks had obtained approximately 3.3 million Likes on her FB Page. [DE 84-1]. In newspaper and magazine articles, Mattocks was credited by BET executives for playing a critical role in reviving interest in *The Game*, and in making it a massive

success with viewers. [DE 83-20] [DE 83-21] [DE 83-22]. BET even flew Mattocks out to Los Angeles, California for promotional interviews to discuss her impact on BET's decision to bring *The Game* back on the air. [DE 46 at ¶15]. After the premier, BET made overtures to Mattocks about wanting to acquire ownership rights to her FB Page, but stopped short of making a formal offer. [DE 83-2 at 67:16-22; 84-6] [DE 84-6 at ¶3]. At no point did Mattocks ever transfer ownership of her FB Page to BET.

In early February 2011, Facebook temporarily disabled Mattocks' entire Facebook account, an issue that was resolved and her account was restored. [DE 83-5] [DE 83-26]. As a result of this incident, however, BET (through Ware) told Mattocks that BET wanted administrative access to Mattocks' FB Page to ensure that Mattocks' FB Page would remain active. [DE 83-26] [DE 84-16]. BET thereafter provided Mattocks with a draft letter agreement that would grant BET administrative access. [DE 84-17]. In response, Mattocks expressed her fear that BET would eventually take control of her FB Page and lock her out, and revised the draft agreement to provide what she viewed to be safeguards against this possibility. [*Id.*]. Ware responded to Mattocks by assuring her that BET had no intent to lock her out of her FB Page. [DE 83-26 at 1] [84-6 at ¶4]. Based on this representation, Mattocks executed the draft letter agreement as originally proposed to her, which provided:

> This letter confirms our agreement that you will provide BET Interactive, LLC ("BET") with administrative access to the Facebook page (the "Page") for "The Game" and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to time, as determined by BET in its sole discretion.

(the "Letter Agreement") [70-13 at 12]. Just a few months later, when BET hired Lespinasse as its social media director, Lespinasse expressed that BET's request for administrative access was also driven by its desire to see the Page Insights to assist in its marketing and promotional efforts. [DE 83-25 at 1]. In his introductory email to Mattocks, Lespinasse wrote the following:

> "I'm JP – Mo [Monique Ware] brought me on board to help run social media here at BET. Would you mind making me an admin of THE GMAE [sic] please? **I want to be able to see the insights, to better understand the audience…what they respond to…etc – as we come up with things to do for the upcoming season**.

[*Id.*] (emphasis added).

Thereafter, the Parties worked together to promote *The Game* on Mattocks' FB Page in the manner previously described, with Mattocks updating the content on her FB Page on almost every occasion. [DE 83-11 at 46:23-47:13; 53:20-54:7; 80:24-81:8] [DE 83-19] [DE 84-13]. Presumably because of its growing popularity and success, on several occasions during the courtship, BET made offers to acquire Mattocks' FB Page, either through direct purchase, or through employing Mattocks as a BET employee or permanent freelancer. [DE 84-8] [DE 84-9] [DE 84-10]. Each offer, however, was contingent upon Mattocks effectively

surrendering all ownership rights in her FB Page to BET, and granting BET the absolute right to terminate the contract (and her) at any time, with or without cause, in its sole discretion. [DE 84-8 at ¶3(ii)] [DE 84-9] [DE 84-10 at ¶3]. Mattocks consequently rejected each offer. [DE 83-17] [DE 84-9].

Frustrated with BET's one-sided acquisition attempts and fearful that BET would find a way to lock her out of her FB Page, after BET's June 2012 formal offer, Mattocks wrote to BET that until such time as the parties could reach an amicable and mutually beneficial agreement, she would change (but not remove) BET's level of administrative access to her FB Page.[4] [DE 83-2 at 64:4-65:9; 67:5-68:2] [DE 83-17].   Mattocks stated that she would raise BET's level of administrative access upon formalization of an eventual agreement. [DE 83-17]. Shortly thereafter, Mattocks temporarily changed BET's level of administrative access from "Manager" to "Moderator" and then a few minutes later, to "Insights Analyst." [DE 70-13 at 7, 8].   Importantly, however, BET throughout this time continued to possess "administrative access" as required by the Letter Agreement. And, as an Insights Analyst, BET could review Insights Reports, which detailed the metrics and social analytics of Mattocks' FB Page (precisely what Lespinasse desired, *see* [DE 83-25]) and, importantly, is not accessible to those without

---

[4] When Mattocks' FB Page was created, there was only one level of administrative access. On or about May 2012, Facebook introduced five levels of administrative access: (1) Manager, (2) Content Creator, (3) Moderator, (4) Advertiser, and (5) Insights Analyst.

administrative access. [DE 83-25] [DE 83-11 at 80:24-81:8; 83:24-84:10; 84:18-85:16]. Although as an administrator on Mattocks' FB Page at the Insights Analyst level, BET did not have the ability to manually update the content on Mattocks' FB Page, at no point did Mattocks ever refuse to perform any requested updates. [DE 83-11 at 46:23-47:13] [DE 83-8 at 62:8-10] [DE 83-2 at 67:25; 85:1-8; 170:13-15]. Again, this is important as the course of dealing between the Parties demonstrates that BET would almost exclusively update the content on Mattocks' FB Page by requesting Mattocks to do so. [DE 83-11 at 80:24-81:8] [DE 83-2 at 35:1-5; 63:17-24; 85:1-8].

Following the temporary change of BET's level of administrative access, BET never reached out to Mattocks to attempt to achieve a mutually beneficial agreement. Instead, in July and August 2012, BET, unilaterally and unbeknownst to Mattocks, communicated directly with Facebook seeking the removal of Mattocks' FB Page. Worse, BET also sought the transfer/migration of the over six million Likes on Mattocks' FB Page to a Facebook page BET created for *The Game* sometime between May 2011 and January 2012. Prior to the transfer, BET's Facebook page had accumulated only 129 Likes since its creation. [DE 83-11 at 62:21-63:3; 92:18-93:9] [DE 83-30] [DE 83-31].

In their communications with Facebook, BET representatives repeatedly (mis)represented that Mattocks' FB Page was "inauthentic" and "unauthorized,"

and at no point disclosed its relationship with Mattocks, or that it was operating Mattocks' FB Page in conjunction with Mattocks. [DE 83-30] [DE 83-31]. Thereafter, based on this selective (mis)information provided to it by BET concerning the alleged inauthentic nature of Mattocks' FB Page, and Facebook's review of Mattocks' FB Page, Facebook told BET that it could disable Mattocks' FB Page and transfer/migrate the over six million Likes Mattocks had obtained over to BET's Facebook page for The Game [DE 83-31 at 4-6].

On August 27, 2012, BET sent Mattocks an abrupt letter instructing her to cease and desist from thereafter using BET's intellectual property. [DE 70-13 at 13-14]. *That same day*, before Mattocks had an opportunity to react to the demand, Mattocks' FB Page was removed from Facebook and the over six million Likes she had obtained were contemporaneously transferred/migrated from her FB Page to BET's Facebook page for *The Game*. [DE 83-31 at 2-3]. Mattocks thereafter retained attorney Mark Bowen, Esq. who wrote a letter to Facebook appealing the decision, but Facebook did not respond. [DE 84-18].  Instead, Facebook wrote an email to BET indicating that it was surprised that BET did not inform the other page administrator (Mattocks) of the removal of Mattocks' FB Page, and of the demand for the transfer/migration of the over six million Likes she had obtained. [DE 83-31 at 1].  BET directed Facebook to discuss this concern with Ms. Carter-Jenkins in BET's legal department. [*Id.*].  BET did not produce

11

any additional documentation relevant to this dispute subsequent to this communication.

### C.    Standard of Review

Summary judgment "is an extreme remedy which should not be granted, unless the moving party has established his right to judgment beyond controversy." *United States v. Feinstein*, 717 F. Supp. 1552, 1555 (S.D. Fla. 1989). Indeed, inasmuch as summary judgment "is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment. *Tippens v. Celotex Corp.*, 805 F.2d 949, 952-53 (11th Cir. 1986).

Consistent with the foregoing, a District Court's decision to grant a motion for summary judgment is reviewed by the Court of Appeals *de novo*. *Mais v. Gulf Coast Collection Bureau, Inc.*, 13-14008, 2014 WL 4802457 (11th Cir. 2014); *Waganer v. Sea-Land Serv., Inc.*, 486 F.2d 955, 960 (5th Cir. 1973) (holding where factual issues have not been tried, the entry of summary judgment is reviewed under the "rigid standards attendant upon the entry of summary judgment under Rule 56, F.R.Civ.P."). In so doing, the Court of Appeals must "draw all inferences and review all evidence in the light most favorable to the non-moving party." *Id.*

## SUMMARY OF THE ARGUMENT

The District Court overlooked substantial evidence creating genuine issues of material fact, and as a result, erred in granting BET's Motion for Summary Judgment as to each of Mattocks' claims. The District Court's Order granting summary judgment is underpinned by three determinative findings that are contrary to the record evidence.

First, the District Court erroneously determined that Mattocks failed to produce substantial evidence that Facebook's decision to remove Mattocks' FB Page and transfer/migrate the Likes Mattocks had obtained over to BET's Facebook page, was based on anything other than Facebook's policies of preventing inauthentic and unauthorized activity. [DE 101 at 11, 15]. In so ruling, the District Court disregarded the evidence showing that BET failed to inform Facebook of the fact that it had a relationship with Mattocks and that the Parties, at that time, were jointly operating Mattocks' FB Page. These facts, if conveyed to Facebook, would have defeated BET's quest to remove Mattocks' FB Page and transfer/migrate the Likes. As explained herein, Mattocks' FB Page was not "inauthentic" or "unauthorized," and therefore, pursuant to Facebook's guidelines, should not have been removed. The District Court also overlooked the surreptitious nature and impropriety of BET's actions and its impact on Facebook's decision, which becomes clear when evaluated against the backdrop of the history

13

between the Parties, and BET's constant efforts to acquire ownership of Mattocks'

FB Page.    These errors resulted in the entry of summary judgment against

Mattocks' claim for tortious interference with her agreement with Facebook, and

Mattocks' claim for conversion. [5]

Second, the District Court incorrectly found that Mattocks breached the

Letter Agreement by determining that Mattocks prevented BET from updating the

content on her FB Page, by virtue of Mattocks' temporary changing (but not

removal) of BET's level of administrative access. [DE 101 at 12-13].  However,

the District Court improperly combined two separate contractual provisions of the

Letter Agreement and interpreted the Letter Agreement as containing an obligation

on Mattocks to provide BET with the ability to manually update the content, which

was not intended by the Parties. Indeed, the District Court also overlooked the

evidence that BET did not bargain for the right to manually update the content, nor

did it have any interest in doing so.  The Letter Agreement, drafted by BET alone,

does not provide for such a right, and it was entered into at BET's insistence to

ensure that Mattocks' FB Page would remain active.  Further, although BET could

not manually update content after its level of administrative access was temporarily

changed, the District Court dismissed the unrebutted evidence that at no point did

---

[5] As the gravamen of Mattocks' claims stem from her FB Page, in an effort to
narrow the issues for appeal, Mattocks does not appeal the District Court's entry of
summary judgment as to Count II, which relates to her Twitter account.

Mattocks ever refuse any of BET's requests to update the content on her FB Page. Overlooking this fact is important, as it was normal course in their relationship for Mattocks – **not BET** – to manually update the content on the FB Page, on her own, and at BET's request. The District Court also erred because its ruling was based on the faulty premise that the Letter Agreement required BET to be granted "full" administrative access to Mattocks' FB Page, yet such a descriptive reference does not exist in the Letter Agreement. In fact, at the time the Letter Agreement was entered into, there was no such thing as "full" administrative access, and, as such, BET could not have bargained for a right that did not exist at the time. The foregoing errors resulted in the entry of summary judgment as to Mattocks' claim for breach of contract and breach of good faith and fair dealing.

Finally, in deciding an issue of first impression, the District Court set harsh legal precedent by determining that Mattocks did not have any protectable interest in the Likes she had obtained on her FB Page, and, as such, could not maintain a claim for conversion against BET, when it orchestrated the transfer/migration of these Likes from Mattocks' FB Page to its own Facebook page for *The Game*. [DE 101 at 15]. However, the District Court's ruling is grounded in presumptions that are not tethered to any applicable case law, and provides no basis for the legal distinction between the convertible nature of business goodwill and the convertible nature of a Facebook Like. Considering the novelty and complexity of this issue,

the District Court erred in finding that there was no genuine issue of material fact that Mattocks could not claim an ownership interest in the over six million Likes she had obtained.

The foregoing errors require reversal of the District Court's entry of summary judgment.

## ARGUMENT / CITATIONS OF AUTHORITY

**A.    The District Court Erred in Determining that Mattocks Did Not Produce Substantial Evidence that Facebook's Decision, Which was Prompted by BET's Request, to Remove and Disable Mattocks' Facebook Page and Contemporaneously Transfer the Likes Mattocks Had Obtained Over to BET's Facebook Page, was Based on Anything Other than Facebook's Policies.**

In granting BET's Motion for Summary Judgment on Mattocks' claim for tortious interference with her agreement with Facebook, and her claim for conversion, the District Court disregarded the evidence demonstrating that BET acted wrongfully, under false pretenses, and with improper motives, when it surreptitiously orchestrated the removal of Mattocks' FB Page and the transfer/migration of the more than six million Likes she had obtained.  When the propriety of BET's actions are evaluated against the backdrop of the history between the Parties and BET's constant efforts to acquire ownership of Mattocks' FB Page, *at a minimum*, a genuine issue of material fact is revealed.

The privilege to interfere in another's contract is not unlimited and does not afford an absolute shield to liability. *CSDS Aircraft Sales & Leasing, Inc. v. Lloyd Aereo Boliviano Airlines*, 09-CIV-22274, 2011 WL 1559823 (S.D. Fla. 2011). Even for "non-strangers to a contract, the privilege to interfere is a valid defense only to the extent the interference was done in good faith." *Id; see also KMS Restaurant Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) ("even where the defendant's motive is not purely malicious, a tortious interference

17

claim may succeed if improper methods were used."). Parties are "disqualified from asserting the privilege if they act maliciously or with conspiratorial motives because the privilege does not encompass the purposeful causing of a breach of contract." *Id.* (Internal citations omitted).

Similarly, to state a claim for conversion, a party must show that the other party committed an unauthorized or wrongful act that deprived the other of his property permanently or for an indefinite time. *See, e.g. Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1291 (11th Cir. 2001); *Edwards v. Landsman*, 51 So.3d 1208, 1213 (Fla. 4th DCA 2011).

The record evidence at bar, *at a minimum*, creates a genuine issue of material fact as to whether BET acted wrongfully, under false pretenses, and/or with improper motives. Indeed, the record evidence establishes that there is no dispute that BET placed great value on Mattocks' FB Page and wanted to acquire it from the beginning of its relationship with Mattocks.

For example, in November 2010, in an internal BET email authored by employee Selena Spencer regarding the development of social media plan for *The Game*, Ms. Spencer wrote: "I wanted to let you know that I did hold The Game on BET as a possible Facebook page **if we can't get the other page**." [84-2 at 1] (emphasis added). After *The Game*'s successful premiere in January 2011, Ware indicated that BET's CEO, Debra Lee, wanted to know why BET did not yet own

18

Mattocks' FB Page. [DE 83-2 at 67:16-22; DE 84-6 at ¶3].  In November 2011, Vicky Free, BET's Chief Marketing Officer, stated that she was "100% on board with securing the rights/ownership of [Mattocks' FB Page] via a straight out purchase or hiring [Mattocks] as an employee." [DE 84-7].  Martez Moore, BET's Executive Vice President of Digital Media, believed the "best way/lowest cost" to do so was to employ Mattocks full-time or as a freelancer and to "make a portion of her compensation consideration for purchasing Mattocks' FB Page." [*Id.*].

In September 2011, in considering Mattocks for a social media specialist position with BET, BET employees provided the following feedback on Mattocks: "… [Mattocks] appears to have thorough knowledge in the 'social media' arena. Very plugged in…**What makes her valuable to us is her keen sense of the viewer and her ability to promote in a way that is powerfully received by the audience**." [DE 83-10 at 2] (emphasis added). Ware also offered this ringing endorsement: "**Stacey will be a force in this space. What she has done on her own is pretty amazing**. We should jump at the chance to develop such a talent and in the process learn from her…" [*Id.* at 1] (emphasis added).

Additionally, Ware provided the following input regarding the importance of Mattocks' FB Page and social media to *The Game*'s success:

"Social media was key in breaking the success of The Game as the return of the show was deeply rooted in social. There was a spirit of "we organized" and "we got the show to come back" which provides a tangible accomplishment and in turn fortifies our community. The

fans of The Game feel truly responsible [sic] the return of the show."

[DE 83-23 at 1]. This sentiment is amplified by Ware in the same email, when she discusses BET's relationship with Mattocks and Mattocks' impact on the success of *The Game*:

> There were both Twitter & FB accounts for The Game prior to BET licensing the rights to the show. They were not even CW owned accounts, they were truly fan accounts. **There was a FB page that has more fans than any other BET fan page**…The nature of the posts were truly from the vantage point of the fan and focused on the stuff that fans would actually care about - cast birthdays, other projects, etc. There were a couple of options: 1. Play hard ball, involve legal, shut down the page and start our own accounts; 2. Form a partnership with the people for the season. Janet and I talked about what to do and I recommended that we actually keep the true fans around to manage the accounts. I got the name of the FB person from the Twitter person (smile), spoke to both of them and they were happy to be the official keepers of The Game and Facebook accounts. I thought we should do this instead of doing it ourselves for the following reasons: a) there was a great social story and spirit I didn't want to lose; b) **Stacey (facebook) had done a pretty amazing job with NO network assets <u>support</u>**; c) we would have had to start from scratch pretty late in the Game (excuse the pun); and d) **there was possible backlash from FB fans if they learned that we shut down the page they felt drove the return of the show**.

[*Id.* at 2] (emphasis added).

In addition to BET's own internal communications, the value and importance BET placed on Mattocks and her FB Page is also evident from BET's contract proposals to Mattocks. For instance, in December 2011,[6] BET presented

---

[6] Although the contract proposal is dated December 15, 2010, the Parties agree that the contract should be dated December 15, 2011. This is evident from the

20

Mattocks with a proposed contract for employment as a social media correspondent, which would have required Mattocks to manage the social media content for *The Game*. [DE 84-8]. The contract was unacceptable to Mattocks, as it would have paid her a maximum of $85,000.00 over a one year period and BET would have maintained the right to terminate the contract at any time, with or without cause, in its sole discretion. [*Id.*]. The proposed contract also required Mattocks to surrender all right, title, and interest to her FB Page, which Mattocks was not inclined to do. Mattocks declined the offer. [*Id.*].

In January 2012, when Mattocks had obtained in excess of 5.8 million Likes on her FB Page, BET verbally offered to acquire rights to her FB Page (as well as Mattocks' Twitter account for *The Game*) for $15,000.00. [DE 84-9]. Mattocks countered with an offer of $1,200,000.00 based on a then-recent study valuing the worth of Facebook pages based on the number of Likes thereon. [*Id.*]. BET eventually rejected Mattocks' offer.

In June 2012, BET presented Mattocks with another proposed contract for a three year term, whereby BET would pay Mattocks $4,166.66 per month. [DE 84-10]. The maximum compensation Mattocks could earn during the three year term, however, was set at $50,000.00. [*Id.*]. In return, Mattocks would serve as a Social Media Specialist for BET's scripted programming, and would be required to write

"Term/Termination" provision, which lists the dates of employment as December 19, 2011 to December 31, 2012.

posts, filter content, engage with fans, etc. on all social media platforms. [*Id.*].  The proposed contract provided that BET would be the sole owner of all right, title, and interest to the proceeds of Mattocks' services under the agreement, but that Mattocks would retain ownership rights to her FB Page, subject to BET's intellectual property rights. [*Id.*]. However, Mattocks viewed BET's proposed rights of ownership of her FB Page to be illusory, as BET would own all rights to all work performed by Mattocks during the agreement; thus, there would be no practical way for Mattocks to maintain ownership control of her FB Page. [DE 83-17].  Mattocks thus rejected the offer due to concerns over job responsibilities, compensation, and most importantly, ownership of her intellectual property. [*Id.*].

As explained by Mattocks' damages expert, Fernando Torres,[7] the reason for BET's interest in Mattocks' FB Page was the clear and unmistakable impact her FB Page had in increasing the number of fans of *The Game* and, consequently, its popularity and television ratings. [DE 84-11 at 5-9].  Indeed, part of BET's amazement at the following Mattocks was able to attract was that Mattocks had obtained almost two million Likes prior to being contacted by BET and during the period *The Game* was **canceled and off the air, without the use of any "network**

_____

[7] Mr. Torres is an intellectual property economist with nearly thirty years of work experience in economics, financial, analysis, and business management. He is a member and Chief Economist at IPmetrics LLC, an intellectual property consulting firm specializing in the strategic analysis, valuation, and expert witness assessment of the full range of intangible assets. [DE 72-2 at ¶2].

**assets" or "support,"** as observed by Ware. [DE 83-23 at 2] [DE 84-1]. Because BET produces and distributes content and finances its activities partially by selling advertising time, the higher the ratings of its shows, the more revenue it would be in a position to generate. [DE 84-11 at 5-9]. It reasonably follows, then, that Mattocks' FB Page played a central role in increasing BET's advertising revenue for *The Game*, which was, and is, substantial.[8] Thus, it is incontrovertible that Mattocks' FB Page was of significant value and importance to BET.

In this light, when Mattocks temporarily changed BET's administrative access, one can reasonably conclude that BET used this temporary change to declare a pretextual breach of the Letter Agreement by Mattocks (a subject discussed in Section B, *infra*), and pounce on the opportunity to have Mattocks' FB Page removed and transfer/migrate all the Likes Mattocks had obtained over to BET's own Facebook Page for *The Game*. This is precisely what occurred, and is in some sense ironic, inasmuch as BET enticed Mattocks into giving it administrative access to her FB Page under the pretense that BET's access would ensure that Mattocks' FB Page would remain active. [83-2 at 90:17-25] [DE 83-26]

---

[8] On February 20, 2014, Appellant filed an Amended Motion to Compel documents evidencing the revenue BET generated from The Game so that Appellant could determine the financial benefit she generated for BET. However, the Magistrate Judge did not adjudicate the Motion, which was resolved in Appellant's favor, until over five and a half months later on August 7, 2014, which was after summary judgment had been fully briefed. Therefore, the District Court did not have ability to evaluate this evidence.

[DE 84-16].

On or about July 24, 2012, Lespinasse (BET's Social Media Director) emailed Facebook employee Megan Carnes to introduce Carnes to Tia Carter Jenkins, BET's Vice President of Business and Legal Affairs, and indicated that BET had a "rather involved" "initiative" (*i.e.*, a plan to remove Mattocks' FB Page and transfer the Likes Mattocks had obtained over to BET's own Facebook Page for *The Game*) that Jenkins would need to discuss with Carnes. [DE 83-30 at 7]. Jenkins then informed Carnes that she wanted to discuss how to transition "**unauthorized** FB Pages to official BET FB Pages." [*Id.* at 6] (emphasis added). Carnes responded by stating that Facebook "will assist you from our side on this **in-authentic FB page** request that you have, and provide you with your options." [*Id.* at 5] (emphasis added). Another Facebook employee, Erin Ott, then instructed Jenkins to submit a migration request to transfer the Likes from "**unauthorized**" pages to the "**authentic**" BET page. [*Id.* at 4] (emphasis added).  In response to Jenkins' inquiries, another BET employee, Emilie Lara, responded, in part, "[n]ote that Pages are intended to be managed by representatives of a brand and **"fake" pages** managed by individuals **not associated with a brand** are in violation of our policies." [*Id.* at 3] (emphasis added).  BET never advised Facebook of its association with Mattocks.

On August 21, 2012, Lespinasse sent Carnes an email with **four** Facebook

pages belonging to Mattocks, including a fan page for the BET reality television show *Real Husbands of Hollywood* and Mattocks' FB Page for *The Game*, which Lespinasse stressed was "**the most important**." [DE 83-31 at 9-10] (emphasis added). Lespinasse expressed that, before disabling Mattocks' FB Page, he wanted to ensure that there would not be any issues transferring/migrating the Likes from Mattocks' Facebook pages to BET's corresponding pages for the shows. [*Id.*]. Carnes answered that she would try to get an answer on the transfer/migration requests since they were a "**red-alert issue at high levels at BET**." [*Id.* at 8] (emphasis added). Carnes subsequently responded:

> There is 1 shared admin "between the two "The Game" pages (both in-authentic and authentic ones). JP – Does that sound right? Probably a good idea to delete this person's admin rights on The Game authentic page, if they are in fact the person in violation. The in-authentic Real Husbands of Hollywood page – our Ops team noticed it is being run by Reality Wives, which appears to be an organization. Is Reality Wives the entity BET is pursuing legal action against? LMK answers to above, and we'll circle back with Page Ops and then let you know what their thoughts are on whether migration or IP shutdown will be your options for each of the 4 situations in question.

[*Id.* at 7]. Lespinasse answered, in part, that he was the "shared admin" - notably confirming that BET understood that it still had administrative access to Mattocks' FB Page- and that he would prefer not to be removed from the "**in-authentic** [page] prior to migration." [*Id.* at 6-7] (emphasis added).

These communications establish that BET did not previously inform

25

Facebook of Mattocks' Facebook alias (*i.e.,* the name Mattocks used to operate her fan pages, *to wit*: Reality Wives), the nature of her relationship with BET, or that Mattocks owned the FB Page and, at that time, operated same lawfully and in conjunction with BET.  In fact, BET has not disputed that it kept this information from Facebook.   But, by intentionally omitting these determinative facts and consistently referring to Mattocks' FB Page as "inauthentic" or "unauthorized" in its communications with Facebook representatives, one can reasonably conclude that BET knew that Facebook's policies would result in the removal of Mattocks' FB Page and the transfer of Likes she had obtained.  This is especially true where Facebook's Emilie Lara explained to BET its policy that "Pages are intended to be managed by representatives of a brand and **"fake" pages** managed by individuals **not associated with a brand** are in violation of our policies." [DE 83-30 at 3] (emphasis added).  Again, had BET been truthful and disclosed the reality that Mattocks was associated with BET, Facebook would likely not have acted in the manner urged by BET.

Further evidence of Facebook's lack of knowledge about the Parties' relationship and what BET was attempting to surreptitiously accomplish is Facebook's email to BET, upon receiving a letter from Mattocks' counsel, Mark Bowen, Esq., after Mattocks' FB Page was removed. [DE 83-31 at 1]. Two days after Mattocks' FB Page was removed, Bowen mailed a letter to Facebook and

stated that Mattocks wished to appeal Facebook's decision to remove her FB Page, and requested a prompt explanation and justification for the removal. [DE 84-18]. In response to the letter, Facebook wrote to Lespinasse:

> I just received notification from our legal team that we've received some expression of concern from **one of the admins** of the old "The Game" page that we migrated into the new page recently based on your request. **I know that you were admins of both the "The Game" pages**, and **I wanted to let you know in case maybe the admins weren't aware of the migration of the old page**.

[DE 83-31 at 1] (emphasis added).  Here, Facebook is expressing surprise that Mattocks ("one of the admins") may not have been aware of the removal of her FB Page or the migration request to transfer the Likes Mattocks had obtained.  If the relationship between the Parties was insignificant to Facebook's decision, Facebook would not have sent this email (or the prior one by Emilie Lara) and would likely never have agreed to remove Mattocks' FB Page and transfer/migrate the Likes Mattocks had obtained because Mattocks' FB Page would not have been deemed "inauthentic" or "unauthorized" under Facebook's policies.

Nevertheless, with the inaccurate, incomplete, and intentionally misleading information provided to it by BET, Facebook inevitably informed BET that it could and would shut down Mattocks' FB Page and transfer/migrate the Likes Mattocks had obtained to BET's Facebook Page for *The Game*. [*Id.* at 5]. Tellingly, however, as to Mattocks' Facebook Page for *Real Husbands of*

27

*Hollywood*, which Mattocks operated **without** BET, Facebook responded,

> NO WE CANNOT MIGRATE FANS AS [the Facebook Page] IS IN
> THE VOICE OF SOMEONE REPRESENTING THEMSELVES
> (REALITY WIVES) AND NOT THE SHOW.  AN IP CLAIM CAN
> BE PURSUED.

[*Id.*] [emphasis via CAPS in original].

Ironically, Facebook's explanation here demonstrates that had Mattocks not been persuaded to grant BET administrative access to her FB Page, and had she continued to run it as a true fan page, the only recourse BET would potentially have had against Mattocks would have possibly been an intellectual property infringement claim (if, in fact, Mattocks was even violating BET's intellectual property rights).  Stated differently, like the Real Husbands of Hollywood Facebook Page, BET would not have been able to shut Mattocks' FB Page down or acquire the Likes she had obtained if Mattocks continued to run her FB Page as a fan page, and had Mattocks not granted BET administrative rights to her FB Page.

Simply put, the record evidence strongly suggests, *if not establishes*, that BET intentionally orchestrated the removal of Mattocks' FB Page and transfer/migration of the Likes she had obtained in order to capitalize on Mattocks' years (and countless hours) of hard work.  Indeed, if BET acted solely to protect its own interests, then it would have simply caused Mattocks' FB Page to be removed, without transferring/migrating her Likes to its Facebook page for its benefit.  **The fact that BET desired and successfully attempted to acquire the Likes from**

28

**Mattocks' FB Page illustrates not only BET's improper motive in doing so, but also highlights the inherent and recognized value by BET in the Likes on a Facebook Page – otherwise, why orchestrate the transfer?**

In light of the forgoing, Mattocks submits that there exists, *at an absolute bare minimum*, a genuine issue of material fact as to the propriety of BET's actions, which is a critical factor in Mattocks' claims for tortious interference and conversion claims. Thus, the District Court's entry of summary judgment on those claims was in error and must be reversed. *See United States v. Feinstein*, 717 F. Supp. 1552, 1555 (S.D. Fla. 1989) ("summary judgment is an extreme remedy which should not be granted, unless the moving party has established his right to judgment beyond controversy.").

### B.    The District Court Erred in Determining that Mattocks Breached the Letter Agreement

In determining that Mattocks breached the Letter Agreement as a matter of law, the District Court improperly combined two separate contractual provisions to create an obligation on Mattocks not intended by the Parties, or at a minimum, not specifically delineated by the Parties. The Letter Agreement, **drafted entirely by BET**, provides:

> This letter confirms our agreement that you will provide BET Interactive, LLC ("BET") with administrative access to the Facebook page (the "Page") for "The Game" and that BET will not change the administrative rights to the Page to exclude you from the Page. You also agree that BET may update the content on the Page from time to

29

time, as determined by BET in its sole discretion.

[DE 70-13 at 12]. Thus, the Letter Agreement imposes the following two, **separate** obligations on Mattocks: (1) to provide BET with administrative access; and (2) to permit BET to update the content on her FB Page from time to time as determined by BET in its sole discretion. As detailed below, the District Court improperly merged these concepts, at BET's insistence, to create an unintended and non-delineated meaning of the Letter Agreement that BET was granted "full" administrative access, which the District Court erroneously determined to be **the vehicle by which BET would update the content on Mattocks' FB Page**. [DE-101 at 12-13]. However, as explained herein, BET did not bargain for, or even desire, the right to manually update the content, and, in actuality, updated the content almost exclusively through **Mattocks – not via its own administrative access**.

With this fundamental misinterpretation, the District Court erred in determining, as a matter of law, that Mattocks breached the Letter Agreement in three material respects. First, given the course of conduct between the Parties and the fact that BET did not bargain for, or even desire, the right to manually update the content on Mattocks' FB Page, Mattocks' temporary change – **but not removal** - of the level of BET's administrative access did not prevent BET from updating the content on Mattocks' FB Page. Therefore, Mattocks' temporary

change of BET's level of administrative access was not a material breach of the Letter Agreement.  Second, the record evidence establishes that at no point did Mattocks ever refuse BET's requests to update the content on her FB Page.  In fact, following Mattocks' temporary changing of BET's level of administrative access, BET did not make a single request to Mattocks to update the content on her FB Page; thus, BET cannot say that it was ever prevented from doing so. Third, the District Court's determination that Mattocks granted BET "full" administrative access is not supported by the terms of the Letter Agreement, **which BET drafted**, or applicable case law.  Thus, Mattocks' temporary change - **but not removal** - of BET's level of administrative access did not breach the Letter Agreement.

Each of the above mentioned errors, which resulted in the improper entry of summary judgment on Mattocks' breach of contract and good faith and fair dealing claims, is discussed in turn below. Consequently, for the reasons that follow, the District Court's ruling must be reversed.

i. *BET did not Bargain for or Even Desire the Right to Manually Update Content on Mattocks' FB Page.*

Mattocks does not dispute that after temporarily changing BET's level of administrative access, BET was unable to manually update content on Mattocks' FB Page.  However, this fact is immaterial because, as evidenced by the course and conduct of the Parties in their relationship, BET did not bargain for or even desire the right to manually update the content.  As detailed in Section A above, and as

31

further discussed below, the record establishes that BET only made a "handful" of posts throughout the Parties almost two year relationship.  This was so, as BET wanted Mattocks to update the content herself due to her unique ability to connect with other fans of *The Game*.

For example, in December 2010, regarding the social media plan for *The Game*, Ware (BET's Vice President of Digital Marketing), wrote to other BET employees, "[t]he plan is to feed [Mattocks] info **but let her post in her own voice since she has been pretty successful with the page thus far**." [DE 83-19] (emphasis added).  Additionally, in October 2011, approximately eight months after the Letter Agreement was executed, in explaining to other BET employees how Mattocks' FB Page was operated, Lespinasse wrote, "[o]nce we bring [Mattocks] on board to report to me, ill [sic] have full editorial direction of that page – for now, I feed her info and **she crafts the message for her fans**." [DE 84-13] (emphasis added).  Further, Ware's comments regarding the impact of Mattocks' FB Page on *The Game*'s success also demonstrate this point:

> The nature of the posts [on Mattocks' FB Page] were truly **from the vantage point of the fan** and focused on the stuff that fans would actually care about… **I recommended that we actually keep the true fans around to manage the accounts**…I thought we should do this instead of doing it ourselves for the following reasons: a) there was a great social story and spirit I didn't want to lose; b) **Stacey (facebook) had done a pretty amazing job with NO network assets support**…

[DE 83-23] (emphasis added).

This intended arrangement is also supported by BET's admission that it desired administrative access not so it could manually update content, but to ensure that Mattocks' FB Page would remain active, and to utilize the Page Insights to review fan activity on Mattocks' FB Page in order to analyze the level of overall engagement from fans. [DE 83-26] [DE 84-16] [DE 83-25].   Indeed, when Lespinasse introduced himself (via email) to Mattocks, he wrote:

> "I'm JP – Mo [Monique Ware] brought me on board to help run social media here at BET. Would you mind making me an admin of THE GMAE [sic] please? **I want to be able to see the insights, to better understand the audience…what they respond to…etc – as we come up with things to do for the upcoming season**.

[DE 83-25] (emphasis added). The message of Lespinasse's email is unmistakable: BET's desire for administrative access was also driven by the desire to see the Page Insights to assist in BET's marketing and promotional efforts. During deposition, Lespinasse echoed this intention:

> Q:…When you were an administrator on the page, what would you access on the page?
> A: So during that time period a handful of occasions I would actually post to the page. **I would look at the insights on that page**. There is also a scheduling mechanism that occurs on Facebook so you can preschedule things. So I would do that periodically.

[DE 83-11 at 80:24-81:8] (emphasis added).

                              * * *

> Q. And so when you had administrative access, how often would you log in as an administrator?
> A. Daily.

33

Q. And what were you typically doing daily?

A. Let me clarification that. Certainly daily during the season…**And I was going in and I was looking at the posts. I was looking at the comments to the posts…Certainly looking at the insights where people engaging with the content**…

[DE 83-11 at 83:24-84:10] (emphasis added).

\* \* \*

Q. But on a daily basis take me through a typical day when you would look at the Facebook page and what you would do.

A. So look at the Facebook page. The way that administrative access works is that when you log in as yourself you automatically see the page in the administrator view not in the regular view and of course I am always logged in to Facebook. So I am always looking at things from the administrator view and as I mentioned, **I am clicking on individual posts, seeing you know what the likes and shares and comments were. I would be reading the comments to see what people had to say about the show or the characters about the show. Looking at how the numbers were progressing not just for the page in aggregate but post by post.** And then I was on occasion actually posting something and then I would also what's called on Facebook share. I would go to the Let's Stay Together page which had its own Facebook page and I would click the share button and that content would then share to The Game on the Facebook page. So it was in fact a post.

[DE 83-11 at 84:18-85:16] (emphasis added).

As illustrated, the record evidence establishes, *or at a bare minimum* creates, a genuine issue of material fact concerning Mattocks' contention that BET's desire for administrative access was centered upon using the data from Mattocks' FB Page to assist its marketing and promotional efforts – and, as BET explained to Mattocks, to ensure that Mattocks' FB Page would remain active. The arrangement BET established whereby BET would "feed" Mattocks information and let her

34

"craft the message for her fans," is demonstrative of BET's desire for administrative access and encapsulates its approach to its relationship with Mattocks and Mattocks' FB Page. [DE 83-19] [DE 84-13]. The fact that Lespinasse made rare, "occasional" posts throughout the Parties almost two relationship does nothing to change this paradigm.

If BET wanted to be able to manually update content, it could have bargained for that right, and presented such in the Letter Agreement it drafted and sent to Mattocks for execution.  However, BET cannot now re-write the Letter Agreement to provide it with a right not specifically included therein. *See, e.g.*, *Barakat v. Broward Cnty. Hous. Auth.*, 771 So. 2d 1193, 1195 (Fla. 4th DCA 2000) ("[i]t is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain").

### ii. <u>BET was Never Prevented from Updating the Content on Mattocks' FB Page.</u>

Disregarding all of the foregoing record evidence, the District Court found that Mattocks materially breached the Letter Agreement by temporarily changing BET's level of administrative access, which the District Court found "prevent[ed] the network from posting content."  [DE 101 at 12-13].  In so ruling, the District Court committed legal error by overlooking the **unrebutted fact** that at no point did Mattocks ever refuse any of BET's requests to update content, or otherwise

35

prevent BET from doing the same.  [DE 83-11 at 46:23-47:13] [DE 83-8 at 62:8-10] [DE 83-2 at 67:25; 85:1-8; 170:13-15].  In fact, after the temporary change, BET never requested or even contacted Mattocks regarding updating the content on her FB Page, a request which would have been consistent with the normal course of the Parties' relationship where Mattocks almost exclusively updated the content on the FB Page herself.  Instead, BET used the temporary change as a pretext to claim that Mattocks breached the Letter Agreement in order to acquire the over six million Likes she had worked so hard to obtain.  Based on these record facts, it cannot be said that there is an absence of a genuine issue of material fact that Mattocks breached the Letter Agreement.

> iii.  *The Letter Agreement Did Not Require BET to be Granted "Full" Administrative Access and, therefore, Mattocks' Temporary Change of BET's Level of Administrative Access Did Not Materially Breach the Letter Agreement.*

The District Court committed legal error in concluding that Mattocks granted BET "**full** administrative access to the Page" and that Mattocks breached the Letter Agreement by changing the level of BET's administrative access such that it no longer had "full" administrative access. [DE 101 at 12-13] (emphasis added).  However, because the concept of "full" administrative access did not exist at the time the Parties entered into the Letter Agreement, BET could not have been granted such a right, nor could the Parties have contemplated such a distinction when entering into the Letter Agreement.  Indeed, such a description of the nature

36

of the administrative access that BET claims it sought is not included within the Letter Agreement, which it drafted. Additionally, the District Court erred by invading the province of the jury by interpreting a contractual term (*to wit*: "administrative access") that the court apparently found to be ambiguous.

### a. The Letter Agreement Did Not Require BET to be Granted "full" administrative access

When the Parties negotiated and eventually executed the Letter Agreement, Facebook had only a single level of administrative access, and a particular level of administrative access could not be selected; a person either was or was not a page administrator. Thus, although BET's intent in procuring administrative access was to have access to Page Insight reports (and to ensure Mattocks' FB Page would remain active), such could not be specifically delineated on Facebook at the time. In this regard, per the clear terms of the Letter Agreement, BET and Mattocks agreed only that BET would have "administrative access to the Facebook page." It was not until the middle of 2012 that Facebook introduced five levels of administrative access: (1) Manager, (2) Content Creator, (3) Moderator, (4) Advertiser, and (5) Insights Analyst. [DE 46 at 6, fn.6]. Thus, BET did not, because it could not at the time, bargain for the right to become a Manager of Mattocks' FB Page. Therefore, because Mattocks temporarily changed the level of BET's administrative access, and because BET **at all times** remained an administrator of Mattocks' FB Page with access to, *inter alia*, Page Insights

reports, she cannot be said to have breached the Letter Agreement. BET could not have been granted the right of "full" administrative access (*i.e.*, "Manager" level) since such a right did not exist at the time the contract was executed, not to mention that the adjective "full" (or any similar description) is nowhere in the Letter Agreement.

Mattocks explained this understanding of administrative access in her deposition:

> Q: When you had your conversation with Monique, wasn't it very clear that she said that they wanted to be able to have access to the page to be able to post things?
> A. They didn't say post, just access.
> Q. And what did you think access meant, just to insights?
> A. **I thought that meant that should anything happen to my account again, that they would still be admin of the pages -- of the page.**
> Q. **What would that allow them to do?**
> A. **Whatever they wanted to: post advertisements, delete comments, post if they need to.**
> Q. So when you entered into the letter agreement, you knew that BET wanted to have full access, including all of those things you just mentioned: post, leave comments--
> A: Honestly, I don't know if they wanted full access to it. Just be able to have administration rights to it, which would mean to see behind the scenes.
> Q. So is it your testimony that when you had this conversation with Monique, that Monique said, we want to make sure that we have the insights information?
> A. She -- I remember just access. She didn't say insights, because, as I said before, insights wasn't available at the time. There was less of administration. There wasn't five levels of administration.

[DE 83-2 at 90:12-91:17] (emphasis added). Under repeated (and oftentimes confusing) questioning from BET's counsel on the subject, Mattocks eventually capitulated to BET's counsel insistence that the term administrative access meant "full access in every respect." [DE 83-2 at 92:8-15].   Yet, the District Court disregarded the misleading nature of this repetitive line of questioning by BET's counsel, as well as Mattocks' prior testimony, wherein she was clear that her intent and understanding was for BET to have access to her FB Page in order to view the "behind the scenes" data, and that she (ironically) believed that granting BET administrative access would actually safeguard the accessibility of her FB Page to the fans, by permitting BET to update the content on her FB Page in case she was ever locked out. [DE 83-2 at 90:17-25].   Merely because BET had the "ability" to do everything that Mattocks could do as an administrator does not, *ipso facto*, mean that is what BET bargained for initially.   In fact, as detailed herein, the evidence establishes otherwise.   Again, these facts, *at a minimum*, reveal the existence of a genuine issue of material fact.

Based on the foregoing, Mattocks submits that the District Court committed legal error by ignoring the competing facts and arguments in this case, which, at a minimum, create a genuine issue of material fact as to the rights granted to BET pursuant to the Letter Agreement. *See, e.g., Haiman v. Gundersheimer*, 177 So. 199, 201 (Fla. 1937) ("[i]t is a question of law for the court to determine what

would constitute a breach of the contract and then a question of fact for the jury to determine as to whether or not that thing which would constitute a breach of the contract has occurred."); *Ness Racquet Club, LLC v. Ocean Four 2108, LLC*, 88 So. 3d 200, 203 (Fla. 3d DCA 2011) (holding determination of a breach of a contract is a question of fact).

> b. *Even if, arguendo, the term "administrative access" is ambiguous, the District Court improperly usurped the role of the jury by construing its meaning*

Mattocks contends that the term "administrative access" is unambiguous and that Mattocks complied with her contractual obligations by providing BET with administrative access at all times.  However, the District Court apparently believed the term to be ambiguous, as evidenced by its use of parole evidence (*i.e.*, Mattocks' deposition testimony) to interpret its meaning and defining the phrase to mean "full" administrative access. [DE 101 at 5, 12]. *See, e.g., Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1022 (11th Cir. 2014) (emphasis added) (holding a court may look to parole evidence **only** where the language is ambiguous on its face) (emphasis added). In this regard, "[w]here the wording of an agreement is ambiguous, its interpretation involves question of fact, **precluding summary disposition**." *Smith v. Shelton,* 970 So.2d 450, 451 (Fla. 4th DCA 2007) (emphasis added); *see also Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen and Firemen Ret. Sys. of Detroit*, 50 F.3d 908, 919 (11th Cir.1995) ("[g]enerally, the

40

proper construction of an ambiguous contract term is a question of fact which should be reserved to the jury."). Moreover, the District Court ignored a cardinal rule of contract interpretation that any ambiguity that may exist in a written contract must be construed against the party that drafted the provision; *to wit*: BET in this instance. *See, e.g., Citro Florida, Inc. v. Citrovale, S.A.*, 760 F.2d 1231, 1232 (11th Cir. 1985). Consequently, even if an ambiguity were founds to exist, the District Court was required to construe its meaning against BET- its drafter.

In sum, the District Court's entry of summary judgment in BET's favor - the sole drafter of the Letter Agreement - after apparently determining that a critical contractual term was ambiguous, was in error, and must be reversed.

## C.    The District Court Erred in Granting Summary Judgment on Mattocks' Conversion Claim by Determining that Mattocks Did Not Have a Protectable Interest in the "Likes" She Obtained on Her Facebook Page, and that BET's Transfer/Migration Request of said Likes was Not Wrongful.

The District Court rejected Mattocks' claim for conversion of the over six million Facebook Likes on her FB Page because, as reasoned by the District Court, (1) Mattocks could not establish that she owned a protectable interest in the Likes, and (2) Mattocks could not demonstrate that BET's transfer/migration request was unauthorized or wrongful.[9] [DE 101 at 14-15]. Respectfully, Mattocks submits that the District Court erred in deciding the former issue, one of first impression,

---

[9] Mattocks addressed this second point in Section A above, and therefore will not repeat those arguments herein.

by relying on unfounded presumptions regarding the nature of Facebook Likes and their similarity to the legally convertible interest of goodwill. Thus, the District Court erred in finding that there was an absence of any genuine issue of material fact that Mattocks could not claim an ownership interest in the Likes that she spent years (and countless hours) to obtain, and derived an income from.

The District Court based its holding that Mattocks did not own a protectable interest in the Likes she had obtained on the basis that users are free to revoke their Like by clicking the "unlike" button. [DE 101 at 15]. Citing to *Bland v. Roberts*, 730 F.3d 368, 385 (4th Cir. 2013), the District Court held that if anyone can be deemed to own Likes, it is the individual users responsible for them. [*Id.*]. Yet *Bland* is of no import to the instant matter. The issue in *Bland* was whether a Facebook user's Like of a political campaign Facebook page constituted speech protected under the First Amendment. *Bland* did not involve issues concerning the value or protectable nature of Facebook Likes, the relationship between Likes and the page administrator, or any other issue relevant to the instant case.

Moreover, the fact that a user may "unlike" Mattocks' FB Page does not negate Mattocks' interest in the value of the remaining Likes on Mattocks' FB Page existing on the date of conversion. Indeed, it is well-established that an action for conversion will lie for the wrongful taking of intangible business interests, such as goodwill. *See Joe Hand Promotions, Inc. v. Creative Entm't,*

42

*LLC*, 978 F. Supp. 2d 1236, 1241 (M.D. Fla. 2013); *Total Mktg. Techs., Inc. v. Angel Medflight Worldwide Air Ambulance Servs., LLC,* 2012 WL 33150, at \*3 (M.D. Fla. Jan.6, 2012); *In re Corbin's Estate*, 391 So. 2d 731, 733 (Fla. 3d DCA 1980). Florida also recognizes business reputation, at least to the extent it approximates goodwill, as a protectable interest under the United States Constitution, and provides people with the "legal guarantees of present enjoyment of goodwill, *i.e.* the value inhering in the favorable consideration of customers arising from a business' reputation as being well established and well conducted." *WAM Properties, Inc. v. Desoto County, Florida*, 758 F. Supp. 1468, 1471-72 (M.D. Fla. 1991) (citation omitted). *See also In re Corbin's Estate*, 391 So. 2d at 733 (holding the recovery for conversion extends to business good will); *Benihana of Tokoyo, Inc. v. Benihana, Inc.*, 828 F. Supp. 2d 720, 728 (D. Del. 2011) (applying Florida law) (same).

A Facebook user's Like is the tangible and equivalent representation of a customer's endorsement of an entity. Thus, the number of Likes on a Facebook page represents the amount of support or goodwill the page has garnered. Just as a Facebook user can withdraw his/her Like, so can a customer decide that s/he no longer wishes to support a particular entity. Even though an entity may lose customers, this does not mean that the remaining customers have no value to the entity. Rather, if a valuation of that entity is performed, it would be based*, in part*,

43

on the number of customers at the time of the valuation. [DE 84-11 at 13].

Likewise, even though fans of Mattocks' FB Page could have withdrawn their

Likes at any time, Mattocks would still have a protectable interest in those Likes

existing on her FB Page at the time of the valuation (*i.e.*, in this case, the time of

the conversion). *See, e.g., In re Corbin's Estate*, 391 So. 2d at 733 ("The proper

measure of damages for conversion in Florida is the interest's reasonable market

value, measured as of the time and place of conversion"). *See also* [DE 84-11 at

13]. Therefore, Mattocks respectfully submits that Facebook Likes are the tangible

and equivalent representation of goodwill, which is a protectable property interest

capable of being converted.

The tangible value of a Facebook Like is also evident from the fact that

Mattocks derived income from them. For example, Mattocks monetized referrals to

her FB Page mainly through posting links on her FB Page, which would direct

users to the subject-based social networking site Sulia.com. [DE 84-11 at 12]. In

brief, Sulia monetizes posts by its members by having advertising appear along

side members' posts. [*Id.*].  Sulia then pays its members (*i.e.,* Mattocks) based on

how many clicks or views that post receives.  [*Id.*].  Thus, while Sulia's corporate

representative testified that it did not track payments made to Mattocks from the

FB Page directly (compared to other pages she operated), it is beyond question that

some of the payments made to Mattocks came from her posts on the FB Page. [DE

83-32 at 18:6-22].

Nevertheless, the District Court concluded that "[g]iven the tenuous relationship between 'likes' on a Facebook Page and the creator of the Page, the 'likes' cannot be converted in the same manner as goodwill or other intangible business interests." [DE 101 at 15]. For support, the District Court cited to *In re Corbin's Estate*, *supra*, but *In re Corbin's Estate* actually **supports** Mattocks' position. Therein, the court held that the recovery under a claim for conversion extends to the goodwill of a business. *Id.* at 733. The court cited, and placed heavy emphasis on William L. Prosser*, Law of Torts*, wherein Prosser commented:

> There is perhaps no very valid and essential reason why there might not be conversion of an ordinary debt, the good will of a business, or even an idea, or "any species of personal property which is the subject of private ownership;" but thus far other remedies apparently have been adequate, and **there has been no particular need or demand for any extension of the rather drastic relief of conversion beyond rights customarily represented by documents**.

*Id.* at 733 (citing William L. Prosser*, Law of Torts* 82-83 (4th ed. 1971) (emphasis added). Prosser's explanation of the rationale behind the rigid application of a conversion claim demonstrates that the claim should adapt to modern societal demands. The District Court's holding that there is an established "tenuous relationship between Likes and the Facebook page creator" such that "likes cannot be converted in the same manner as good will or other intangible business interests," lacks evidentiary or case law foundation, and cuts directly against

45

Prosser's commentary and the *In re Corbin's Estate* court's reliance upon same.

This spirit of Prosser's commentary is also reflected in *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, *8 (N.Y. 2007), where the New York Court of Appeals explained that it is time for courts to adopt a more modern approach to claims for conversion in light of new and evolving areas of technology:

> [I]t is the strength of the common law to respond, albeit cautiously and intelligently, to the demands of commonsense justice in an evolving society…[t]hat time has arrived. The expansion of conversion to encompass a different class of property, such as shares of stock, was motivated by society's growing dependence on intangibles. It cannot be seriously disputed that society's reliance on computers and electronic data is substantial, if not essential. Computers and digital information are ubiquitous and pervade all aspects of business, financial and personal communication activities. Indeed, this opinion was drafted in electronic form, stored in a computer's memory and disseminated to the Judges of this Court via e-mail. We cannot conceive of any reason in law or logic why this process of virtual creation should be treated any differently from production by pen on paper or quill on parchment…[i]n light of these considerations, **we believe that the tort of conversion must keep pace with the contemporary realities of widespread computer use**.

*Id.* at 291-92 (internal citations omitted) (emphasis added).  The foregoing case law is particularly relevant in today's society, in which the "intangible" is gaining an ever-increasingly dominant role, due in large part to the development of social media and related technologies.  These developments force us to reexamine old notions of how we define "ownership" of property and adapt our analysis to

46

conform to this growing intangible society, which includes recognizing the fact that Facebook Likes can be considered a protectable interest and used by several different Parties, including Facebook page administrators. Indeed, as explained above, Mattocks lawfully used the FB Page and the Likes thereon to generate income. Furthermore, Facebook Likes have a unique and tangible aspect that makes them property capable of being converted. For example, a Facebook Like is tangible in the sense that it is an actual computer "link" between a Facebook Page and a Facebook user, which is a valuable asset [DE 84-21 at 19:22-20:21:24]. This link can be seen on a user's Facebook page, as well as on the Facebook page liked by the user. [*Id.*]. Thus, there is a "link" between a Facebook Like and tangible property. *See Joe Hand Promotions, Inc. v. Jacobson*, 874 F. Supp. 2d 1010, 1021 (D. Or. 2012) (because characteristics of broadcast signals were measurable and perceptible to the senses, they were, in some sense, tangible property capable of being converted). Further, that Facebook transferred the Likes from Mattocks' FB Page to BET's Facebook page for *The Game* establishes that the Likes have traditional property attributes (*i.e.*, they are moveable and transferrable). *See, e.g., Curington v. State*, 86 So. 344 (Fla. 1920) (holding chattels are movable and can be transferred from one place to another). Based on all of the foregoing, Mattocks respectfully submits that the District Court reversibly erred by determining at the summary judgment stage that Mattocks did not have a

protectable interest in the Likes she had obtained on her FB Page, and therefore, that Mattocks could not maintain her claim for conversion.

## CONCLUSION

Despite the existence of a multitude of material, factual disputes, the District Court deprived Mattocks of her right to a jury trial by entering summary judgment in favor of BET. As summary judgment is a drastic remedy that must be exercised with extreme caution, it was reversible error for the District Court to usurp the role of the jury on several issues upon which reasonable minds could differ. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 952-53 (11th Cir. 1986); *Esanu v. Oceana Cruises, Inc.*, No. 1:13-CV-22772-UU, 2014 WL 4954401, at *2 (S.D. Fla. May 5, 2014).

WHEREFORE, for all the foregoing reasons, Mattocks respectfully requests that this Court enter an Order reversing the entry of summary judgment, vacating the Order of Final Judgment, permitting this case to be tried on its merits, and such other and further relief as it deems just and proper.

Dated: November 21, 2014.

Respectfully submitted,
TRIPP SCOTT, P.A.

*/s/ Alexander D. Brown*
Alexander D. Brown, Esq.
Fla. Bar No. 752665
adb@trippscott.com
Adam S. Goldman, Esq.
Fla. Bar No. 86761
asg@trippscott.com

48

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B) because this brief contains 12,162 words, excluding the parts of the brief exempted by Fed. R. App. P 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in size 14, Times New Roman.

*/s/ Alexander D. Brown*
Attorney for Appellant
Dated: 11/21/14

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served via CM/ECF

this 21st day of November, 2014, to the attorneys on the below Service List.

By: <u>*/s/ Alexander D. Brown*</u>

## <u>SERVICE LIST</u>

Gray Robinson, P.A.
*Counsel for Appellee*
1221 Brickell Avenue Suite 1600
Miami, FL 33131
Karen Stetson, Esq.
Fla. Bar. No. 742937
Karen.Stetson@gray-robinson.com

Jenner & Block LLP
*Co-counsel for Appellee*
919 Third Avenue
New York, NY 10022
Susan Kohlmann, Esq.
skohlmann@jenner.com
Luke Platzer, Esq.
lplatzer@jenner.com
Erica Ross, Esq.
eross@jenner.com